# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| DALLIS ROGERS, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-907 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| LOTTERY.COM, INC. f/k/a TRIDENT ACQUISITIONS CORP., ANTHONY DIMATTEO, MATTHEW CLEMENSON, and RYAN DICKINSON, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Dallis Rogers ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lottery.com, Inc. f/k/a Trident Acquisitions Corp. ("Lottery.com" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lottery.com securities between November 15, 2021 and July 28, 2022, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lottery.com, headquartered in Spicewood, Texas, is a technology company that operates a business-to-consumer ("B2C") platform enabling players to remotely purchase legally sanctioned lottery games in the U.S. and internationally.  The Company also provides affiliate marketing services under the LotteryLink brand, and delivers lottery data, such as winning numbers and results, to approximately 400 digital publishers and media organizations.  Formerly known as Trident Acquisitions Corp. ("TDAC"), the Company was formed as a Delaware corporation on March

17, 2016, and its securities traded on the Nasdaq Stock Market ("NASDAQ") under the symbols "TDAC", "TDACW", and "TDACU".  TDAC completed its initial public offering ("IPO") of 20,125,000 units on June 1, 2018.

3.     On October 29, 2021, pursuant to a Business Combination Agreement dated February 21, 2021, TDAC consummated a business combination (the "Business Combination") with AutoLotto, Inc. ("AutoLotto"), which, since its founding in 2015, conducted business as Lottery.com.  Following the closing of the Business Combination, the Company changed its name to Lottery.com, the business of AutoLotto became Lottery.com's business, and the Company's shares began trading on the NASDAQ under the symbol "LTRY".

4.     Throughout the Class Period, Defendants made materially false or misleading statements and/or failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal accounting controls; (ii) the Company lacked adequate internal controls over financial reporting, including, but not limited to, those pertaining to revenue recognition and the reporting of cash; (iii) the Company was not in compliance with state and federal laws governing the sale of lottery tickets; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On July 6, 2022, on a Form 8-K filed with the SEC, Lottery.com disclosed that an internal investigation, conducted by independent counsel, had uncovered "instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment."  In addition, the investigation revealed "issues pertaining to the Company's internal accounting controls."  The July 6, 2022 8-K further disclosed that, in light of the findings of the independent investigation, on June 30, 2022, the Company's Board of Directors (the

"Board") terminated the Company's President, Treasurer, and Chief Financial Officer Ryan Dickinson ("Dickinson"), effective July 1, 2022.

6.      On this news, Lottery.com's stock price fell $0.15 per share, or more than 12%, from a closing price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

7.      On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery.com announced that Chief Revenue Officer ("CRO") Matthew Clemenson ("Clemenson") had resigned on July 11, 2022, effective immediately.  Moreover, the Company provided an update on the independent investigation previously disclosed on July 6, 2022.  The Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery.com had "preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount[,]" and that, "[t]he Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures."

8.      On this news, Lottery.com's stock price fell $0.146 per share, or over 15%, from a closing price of $0.966 per share on July 15, 2022 to a closing price of $0.82 per share on July 18, 2022, on abnormally high volume.

9.      The Company made a series of additional adverse disclosures before finally, on July 29, 2022, in another Form 8-K filed with the SEC, informing the market that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July 29, 2022.  Moreover, because Lottery.com's

resources were not sufficient to fund its operations for a twelve-month period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be forced to wind down its operations or pursue liquidation of the Company's assets.

10.     On this news, Lottery.com's stock price lost 64% of its value in a single trading day, falling $0.52 per share, from a closing price of $0.815 per share on July 28, 2022 to a close of $0.295 per share on July 29, 2022.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Lottery.com is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired Lottery.com securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Lottery.com is a Delaware corporation with principal executive offices located at 20808 State Highway 71 West, Unit B, Spicewood, Texas 78669. Lottery.com's common stock trades in an efficient market on the NASDAQ under the trading symbol "LTRY".

18.     Defendant Lawrence Anthony "Tony" DiMatteo III ("DiMatteo") has been Chief Executive Officer ("CEO") of Lottery.com since 2015 and Chairperson of the Board since October 2021. Defendant DiMatteo signed Lottery.com's Forms 10-K and 10-Q filed with the SEC during the Class Period.

19.     Defendant Dickinson served as Lottery.com's President, Treasurer, and Acting Chief Financial Officer ("CFO") from October 2021 until his termination effective July 1, 2022, and CFO from March 2022 until his termination effective July 1, 2022. Defendant Dickinson signed Lottery.com's Forms 10-K and 10-Q filed with the SEC during the Class Period.

20.     Defendant Clemenson served as Lottery.com's CRO and director from March 2015 until his resignation on July 11, 2022.

21.     Defendants DiMatteo, Dickinson, and Clemenson are referred to herein collectively as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Lottery.com's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Lottery.com's SEC filings and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Lottery.com, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Lottery.com, a Delaware corporation with principal executive offices in Spicewood, Texas, is a leading provider of domestic and international lottery products and services that enable consumers and businesses to purchase purportedly legally sanctioned lottery tickets in the U.S. and abroad online through its proprietary platform, the B2C platform (the "Platform"). TDAC, its predecessor entity, completed its IPO of 20,125,000 units on June 1, 2018.

24.     The Company's revenue is derived from: (i) offering the B2C Platform via Lottery.com's app and websites to users located in certain U.S. and international jurisdictions; (ii) selling LotteryLink Credits to third-party master affiliate marketing partners that can be exchanged by them and by their sub-affiliates for LotteryLink promotion packages that include marketing collateral, prepaid advertising, development services, account management, and prepaid lottery games for use in promotions and marketing activities and promoting the B2C Platform; (iii) offering a proprietary business-to-business application programming interface ("API") of the Platform to enable Lottery.com's commercial partners to purchase lottery games from Lottery.com and resell them ("B2B API"); and (iv) delivering global lottery data, such as winning numbers and

6

results, and data sets of their proprietary, anonymized transaction data pursuant to multi-year contracts to commercial digital subscribers ("Data Service").

25.     On February 22, 2021, TDAC and AutoLotto announced that they had entered into the Business Combination Agreement that would result in AutoLotto (d/b/a Lottery.com) becoming a publicly traded company.  The press release announcing the Business Combination stated, in pertinent part:

> NEW YORK and AUSTIN, Texas, Feb. 22, 2021 (GLOBE NEWSWIRE) - - **Trident Acquisitions Corp.** (Nasdaq: TDACU, TDAC, TDACW) ("Trident") and AutoLotto, Inc. ("Lottery.com"), a leading online platform to play the lottery online or from a mobile device, have entered into a definitive agreement for a business combination that would result in Lottery.com becoming a publicly listed company.
>
> Founded in 2015, Lottery.com empowers users to play the lottery from their phone and on the go. It offers official state-sanctioned lottery games, like Powerball, Mega Millions and state games where permissible. Lottery.com is also the world's largest provider of lottery data to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo and Amazon's Alexa devices.
>
> Lottery.com has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age. Through its online platform, Lottery.com provides official lottery games and enhanced regulatory capabilities by developing innovative blockchain technology, while also capturing untapped market share, including digitally native players.
>
> With the expected proceeds to be received by Lottery.com upon the closing of the transaction, Lottery.com would be well-positioned to accelerate its revenue growth through further expansion in its existing markets and into new high-growth markets both domestically and internationally.
>
> **Lottery.com Investment Highlights**
>
> - **Potential to Significantly Expand Global Market Share:** Leveraging its successful playbook in the U.S., Lottery.com intends to become a global marketplace for legally available lottery games to consumers across the world. At $430 billion of global lottery sales with only 4% online penetration, this is a large market opportunity that is expected to shift to transact online during the next decade.
>
> - **Innovative Ecommerce Platform Bringing an Outdated Industry into the Digital Age:** Lottery.com has developed a world-class safe and secure

mobile lottery platform and app leveraging blockchain technology to maintain an accurate ledger that provides users the ability to play official lottery games and other games of chance directly from their phone. Lottery.com has benefited from a customer acquisition cost of $4.01, with those users producing an average of $30.90 of gross revenue in their first year.

- **Favorable Macro Dynamics Driving Consumers Online:** Betting and gambling industries have begun successfully transitioning to online platforms as pandemic-related changes in consumer behavior have accelerated online and digital adoption. In addition, millennials are increasingly participating in games of chance, including the lottery.

- **Easing Regulatory Environment Propelling Market Growth:** Many states and international governments have been easing restrictions on lottery games in an effort to increase ticket sales and revenue contribution in the form of tax as more and more gaming companies collaborate on lobbying efforts.

- **Poised for Expansion:** From 2016 to 2020, Lottery.com grew gross revenue at a compounded annual growth rate of 322%, and forecasts gross revenue equal to approximately $71 million in 2021, $280 million in 2022 and $571 million in 2023. Lottery.com is currently operating in 11 states across the U.S. and has plans to cover 34 states by the end of 2023. Lottery.com looks forward to announcing upcoming partnerships with significant room to expand into other countries, along with opportunities to grow deeper within its current footprint.

- **Large and Growing Player Pool for Cross Selling Additional Games:** With over 7.5 million visitors in 2020, the Lottery.com platform is capable of distributing a range of wagering and games of chance across large and growing national and international markets.

"Lottery.com's innovative platform has already made significant progress bringing the lottery industry into the digital age and continuing to expand its markets both domestically and internationally," said Vadim Komissarov, CEO of Trident. "With a track record of substantial growth and user base expansion in a relatively short period of time, we are confident that Lottery.com has the ability to cement its place as a leading online platform to both play the lottery and to introduce additional wagering and games of chance worldwide. We believe this transaction will allow Lottery.com to be on a path to reach its true growth potential, and we look forward to working with the team as we introduce their compelling story to the public markets."

Co-founder and CEO of Lottery.com, Tony DiMatteo, commented: "Lottery.com is innovating a legacy industry with ground-breaking technologies poised to capitalize on the large population of active internet and smartphone users in the

U.S. and throughout the world. Over the past several months, we have made significant progress, launching our app in the Google Play Store and expanding domestically into Colorado and internationally through announced partnership plans in Turkey and Ukraine. We believe this transaction will further enhance our ability to grow into new markets as consumers are now, more than ever, engaging with digital and online platforms. The team at Trident shares our vision of growing into a global marketplace for legally available lottery games, and other games of chance, to consumers across the world and we firmly believe this partnership will accelerate our growth."

* * *

**Transaction Terms**

The combined company will have an estimated post-business combination enterprise value of approximately $526 million.

The net proceeds raised from the business combination will be used to support Lottery.com's working capital and global platform expansion.

The proposed business combination contemplates that Lottery.com's stockholders will roll 100% of their equity into the combined company, with no minimum cash requirement to close the business combination.

Upon completion of the transaction, the combined company will be trademarked Lottery.com and its common stock is expected to remain listed on the Nasdaq Stock Market under the new ticker symbol "LTRY."

26.     On February 23, 2021, in a Form 8-K filed with the SEC pursuant to Rule 425 under the Securities Act of 1933, TDAC disclosed additional details regarding the Business Combination Agreement, including the following:

On February 21, 2021, Trident Acquisitions Corp. ("TDAC") entered into a business combination agreement (the "Merger Agreement") with Trident Merger Sub II Corp. ("Merger Sub") and AutoLotto, Inc. ("Lottery.com"). The transactions contemplated by the Merger Agreement are sometimes referred to herein as the "Merger" or the "Business Combination."

Terms used herein as defined terms and not otherwise defined herein shall have the meanings ascribed to them in the Merger Agreement.

***Acquisition of Lottery.com; Acquisition Consideration***

Upon the closing (the "Closing") of the Business Combination, Merger Sub will merge with and into Lottery.com, with Lottery.com as the surviving company, continuing as a wholly owned subsidiary of TDAC, following the Merger and the

9

separate existence of Merger Sub shall cease. At the Closing, each share of Lottery.com Common Stock issued and outstanding as of immediately prior to the Closing shall be converted into the right to receive the Per Share Merger Consideration. "Per Share Merger Consideration" means the quotient obtained by dividing (a) 40,000,000 shares of TDAC Common Stock by (b) the aggregate number of shares of Lottery.com Common Stock (including shares issued upon the conversion or exercise of Lottery.com convertible securities) issued and outstanding as of immediately prior to the Closing (the "Lottery.com Shares"). The Per Share Merger Consideration shall be reduced by the number of shares of TDAC Common Stock equal to the quotient of (i) the amount by which Net Indebtedness exceeds $10,000,000, as mutually agreed between TDAC and Lottery.com (each acting reasonably), divided by (ii) 11.00. "Net Indebtedness" means the amount equal to Lottery.com's Indebtedness, less cash and cash equivalents. For the avoidance of doubt, Lottery.com's Indebtedness shall not include current liabilities or any intercompany Indebtedness between or among Lottery.com and any of its subsidiaries.

The holders of the Lottery.com Shares (the "Sellers") will also be entitled to receive up to 6,000,000 additional shares of TDAC Common Stock (the "Seller Earnout Shares") that may be issuable from time to time as set forth below. The aggregate value of the consideration to be paid by TDAC in the Business Combination (excluding the Seller Earnout Shares) is approximately $444 million (calculated as follows: 40,000,000 shares of TDAC Common Stock to be issued to the Sellers, multiplied by $11.00). Upon the Closing, TDAC will change its name to "LOTTERY.COM."

If, at any time on or prior to December 31, 2021, the daily volume-weighted average price of shares of TDAC Common Stock equals or exceeds $13.00 per share for 20 of any 30 consecutive trading days commencing after the Closing, each Seller shall receive its pro rata portion of 3,000,000 Seller Earnout Shares and Vadim Komissarov, Ilya Ponomarev and Marat Rosenberg (the "Founder Holders") shall receive an aggregate of 2,000,000 shares of TDAC Common Stock. If, at any time on or prior to December 31, 2022, the daily volume-weighted average price of shares of TDAC Common Stock equals or exceeds $16.00 per share for 20 of any 30 consecutive trading days commencing after the Closing, each Seller shall receive its pro rata portion of 3,000,000 Seller Earnout Shares and the Founder Holders shall receive an aggregate of 2,000,000 shares of TDAC Common Stock. The Seller Earnout Shares then earned and issuable shall be issued to the Sellers on a pro-rata basis based on the percentage of the Lottery.com Shares owned by them immediately prior to the Closing.

The parties agreed that immediately following the Closing, TDAC's board of directors will consist of five directors, four of which will be designated by Lottery.com and one of which will be designated by TDAC, such appointment by TDAC to be an independent director.

***Stockholder Approval***

Prior to the consummation of the Merger, the holders of a majority of TDAC's common stock attending a stockholder's meeting (at which there is a quorum) must approve the transactions contemplated by the Merger Agreement (the "Stockholder Approval"). In connection with obtaining the Stockholder Approval, TDAC must call a special meeting of its common stockholders and must prepare and file with the SEC a Proxy Statement on Schedule 14A, which will be mailed to all stockholders entitled to vote at the meeting.

27.    On October 29, 2021, the Company announced the completion of the Business Combination, and that upon the closing, the combined entity was renamed Lottery.com and its warrants and stock would begin trading on the NASDAQ on November 1, 2021. According to the press release:

AUSTIN, Texas, October 29, 2021 -- (GLOBE NEWSWIRE) -- Lottery.com Inc. (Nasdaq: LTRY, LTRYW) ("Lottery.com" or the "Company"), a leading technology company that is transforming how, where and when lottery is played announced today that it has completed its previously announced business combination with Trident Acquisitions Corp. ("Trident"). The transaction was approved at a special meeting of Trident's stockholders on October 28, 2021. Additionally, Trident stockholders elected to retain 99.6% of Trident's outstanding stock, resulting in the Company receiving gross proceeds of over $63 million from the transaction.

Upon the closing, the combined company was renamed Lottery.com Inc. and its common stock and warrants will begin trading on The Nasdaq Stock Market under the ticker symbols LTRY and LTRYW, respectively, on Monday, November 1, 2021.

Tony DiMatteo, CEO of Lottery.com commented, "Today represents a momentous achievement for Lottery.com. I am grateful to all our stockholders for their continued support and the entire Lottery.com team for their dedication."

He continued, "Since we entered our first state, our convenient online platform has resonated with consumers, which has driven our strong growth. As a public company with enhanced access to capital, we plan to continue building on this positive momentum by leveraging our low customer acquisition cost to further expand our customer base, broadening our product offerings, and executing on strategic and synergistic acquisitions. We remain squarely focused on realizing the profitable growth opportunities before us and delivering long-term value to our stockholders."

28.    On November 1, 2021, Lottery.com's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW", respectively.

11

29.     On November 4, 2021, Lottery.com filed with the SEC a Form 8-K announcing that the Business Combination had been consummated on October 29, 2021.

**Materially False and Misleading Statements Issued During the Class Period**

30.     The Class Period begins on November 15, 2021, when Lottery.com filed with the SEC a Form 8-K that announced that, on November 10, 2021, the Board had approved the engagement of Aramino LLP as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the year ended December 31, 2021, and the dismissal of Marcum LLP as the Company's auditing firm.  With respect to Marcum LLP's audits of the financial statements of TDAC (prior to the Business Combination), the Company reported that there were no issues or concerns with any prior financial statement, for the years ended December 31, 2020 and December 31, 2019.  Specifically, the Company stated:

> The reports of Marcum on TDAC's financial statements as of and for the fiscal years ended December 31, 2020 and December 31, 2019, did not contain an adverse opinion or a disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During TDAC's fiscal years ended December 31, 2020, December 31, 2019 and during the subsequent interim period through November 10, 2021, the date of dismissal of Marcum, there were no disagreements between TDAC or the Company and Marcum on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure.
>
> During TDAC's fiscal year ending December 31, 2020, December 31, 2019 and during the subsequent interim period through November 10, 2021, the date of dismissal of Marcum, there were no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended) other than the material weakness in internal controls identified by management related to evaluating complex accounting issues relating to the warrants issued in connection with TDAC's initial public offering, which resulted in the restatement of TDAC's financial statements as set forth in TDAC's Form 10-K/A for the year ended December 31, 2020, as filed with the SEC on June 28, 2021.

31.     Also on November 15, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2021 (the "3Q21 10-Q").  In the 3Q21 10-Q,

Lottery.com stated that, "[i]n connection with the preparation of the Company's financial statements as of September 30, 2021, management identified errors made in its historical financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its common stock subject to possible redemption." Accordingly, the 3Q21 10-Q provided restated values for its common stock.

32.     In addition, the 3Q21 10-Q referenced the fact that the Company had identified a material weakness and determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial statements on Form 10-K/A on June 28, 2021 (the "10-K/A"), in order to comply with a new SEC Staff Statement regarding the classification of warrants. Specifically, with respect to Lottery.com's Controls and Procedures, the Company stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, ***due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021***.

(Emphasis added.)

33.     Defendants went on to state that, other than the matters set forth in the 10-K/A, there were no changes in internal control over financial reporting. Further, Defendants represented that Lottery.com intended to "enhance [its] processes to identify and appropriately apply applicable accounting requirements . . . ." In full, the Company stated:

**Changes in Internal Control Over Financial Reporting**

13

***Other than what was described in the 10-K/A, there were no changes in our internal control over financial reporting*** (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, ***we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements***. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

(Emphases in bold and italics added.)

34.     In connection with the 3Q21 10-Q, Defendants DiMatteo and Dickinson each executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and certified that:

1.  I have reviewed this quarterly report on Form 10-Q of Lottery.com Inc. for the quarterly period ended September 30, 2021;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, is made

known to us by others within those entities, particularly during the period in which this report is being prepared; and

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

35.   Also pursuant to Section 906 of SOX, Defendants DiMatteo and Dickinson certified that the 3Q21 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]o my knowledge, the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report."

36.     On March 31, 2022, the Company issued a press release, also filed as an attachment to a Form 8-K filed with the SEC on that date, which reported Lottery.com's "strong" financial results for the fourth quarter ("Q4") and full-year 2021.  Among the information provided, the Company reported revenue of $21.5 million for Q4 2021 (an increase of $18.2 million over the prior year period) and revenue of $68.5 million for the full year 2021 (an increase of $61 million over 2020).  The Company also reported cash for Q4 2021 of $62.6 million—an increase of $58.8 million over the prior year period.

37.     On April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K").  In addition to the financial metrics reported in the press release the day before, in the 2021 10-K, the Company stated that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but it described this material weakness as one largely related to personnel and staffing—specifically, it related to "the design and operation of the procedures relating to the closing of financial statements."   Defendants reassured investors that the Company had "commenced measures to remediate" such material weakness.  In particular, the Company stated the following:

> In connection with the audits of our condensed consolidated financial statements included in this Annual Report, ***our management has identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements***. These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.
>
> ***We have commenced measures to remediate the identified material weakness***, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly

defining and documenting the segregation of duties for certain transactions and processes. The implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles. We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting.

(Emphases added.)

38.     The Company stated in the 2021 10-K that other than the deficiencies identified, "there was no change in our internal control over financial reporting."

39.     In the 2021 10-K, Defendants DiMatteo and Dickinson executed substantively the same certifications pursuant to Sections 302 and 906 of SOX as set forth in ¶¶ 34-35, *supra*.

40.     On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K, in which it announced its "strong" financial results for the first quarter 2022, ended March 31, 2022 ("Q1 2022").  Among the highlights, Defendants reported that Lottery's Q1 2022 revenues were $21.2 million, an increase of $15.7 million over the prior year period.  The Company further reported Q1 2022 cash of $50.8 million, up $32.5 million over the prior year period.

41.     Also on May 16, 2022, the Company filed its quarterly report for Q1 2022 on Form 10-Q (the "1Q22 10-Q").   In addition to reporting the financial metrics disclosed in the press release on the same day, the 1Q22 10-Q stated that management had "evaluated the effectiveness of our disclosure controls and procedures" and that:

> [b]ased on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, *as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process*[.]

(Emphasis added.)  Critically, however, Defendants were careful to reassure investors that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that *our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material*

17

*respects, our financial position*, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

(Emphasis added.)

42.     With respect to the Business Combination, the 2021 10-K provided that:

On October 29, 2021, the Company and AutoLotto consummated the transactions contemplated by the Merger Agreement. At the Closing, each share of common stock and preferred stock of AutoLotto that was issued and outstanding immediately prior to the effective time of the Merger (other than excluded shares as contemplated by the Merger Agreement) was cancelled and converted into the right to receive approximately 3.0058 shares (the "Exchange Ratio") of Lottery.com. common stock.

The Merger closing was a triggering event for the Series B convertible notes, of which $63.8 million was converted into 3,248,526 shares of AutoLotto that were then converted into 9,764,511 shares of Lottery.com common stock using the Exchange Ratio.

At the Closing, each option to purchase AutoLotto's common stock, whether vested or unvested, was assumed and converted into an option to purchase a number of shares of Lottery.com common stock in the manner set forth in the Merger Agreement.

The Company accounted for the Business Combination as a reverse recapitalization whereby AutoLotto was determined as the accounting acquirer and TDAC as the accounting acquiree. Refer to Note 2, Summary of Significant Accounting Policies, for further details. Accordingly, the Business Combination was treated as the equivalent of AutoLotto issuing stock for the net assets of TDAC, accompanied by a recapitalization. The net assets of TDAC are stated at historical cost, with no goodwill or other intangible assets recorded.

The accompanying consolidated financial statements and related notes reflect the historical results of AutoLotto prior to the merger and do not include the historical results of TDAC prior to the consummation of Business combination.

Upon the closing of the transaction, AutoLotto received total gross proceeds of approximately $42,794,000, from TDAC's trust and operating accounts. Total transaction costs were approximately $9,460,000, which principally consisted of advisory, legal and other professional fees and were recorded in additional paid in capital. Cumulative debt repayments of approximately $11,068,000, inclusive of accrued but unpaid interest, were paid in conjunction with the close, which included approximately $5,475,000 repayment of notes payable to related parties, and approximately $5,593,000 payment of accrued underwriter fees.

Pursuant to the terms of the Business Combination Agreement, the holders of issued and outstanding shares of AutoLotto immediately prior to the Closing (the "Sellers")

were entitled to receive up to 6,000,000 additional shares of Common Stock (the "Seller Earnout Shares") and Vadim Komissarov, Ilya Ponomarev and Marat Rosenberg (collectively the "TDAC Founders") were also entitled to receive up to 4,000,000 additional shares of Common Stock (the "TDAC Founder Earnout Shares" and, together with the Seller Earnout Shares, the "Earnout Shares"). One of the earnout criteria had not been met by the December 31, 2021 deadline thus no earnout shares were granted specific to that criteria. As of December 31, 2021, 3,000,000 of the Seller Earnout Shares and 2,000,000 TDAC Founder Earnout Shares are still eligible Earnout Shares until December 31, 2022.

43.     Lastly, in the 1Q22 10-Q, Defendants DiMatteo and Dickinson executed substantively the same certifications pursuant to Sections 302 and 906 of SOX as set forth in ¶¶ 34-35, *supra*.

44.     The statements referenced in ¶¶ 30-43, *supra*, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, these statements misrepresented and/or failed to disclose that: (i) the Company lacked adequate internal accounting controls; (ii) the Company lacked adequate internal controls over financial reporting pertaining to revenue recognition and the reporting of cash; (iii) the Company was not in compliance with state and federal laws governing the sale of lottery tickets; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

45.     Beginning on July 6, 2022, the true state of Lottery.com's finances and operations was gradually and incrementally revealed in a series of successive disclosures made by the Company.  On July 6, 2022, in a Form 8-K filed with the SEC, Lottery.com disclosed that an internal investigation, conducted by independent counsel, had uncovered "instances of ***non-compliance with state and federal laws*** concerning the state in which tickets are procured as well as order fulfillment" (emphasis added).  In addition, the investigation revealed "issues pertaining to the Company's ***internal accounting controls***" (emphasis added).  The July 6, 2022 8-K further

disclosed that, in light of the findings of the independent investigation, on June 30, 2022, the Board had terminated Defendant Dickinson, the Company's CFO, President, and Treasurer, effective July 1, 2022.

46.     On this news, Lottery.com's stock price fell $0.15 per share, or more than 12%, from a closing price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

47.     Next, on July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery.com announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately.  Moreover, the Company provided an update on the independent investigation previously disclosed on July 6, 2022.  The Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery.com had:

> preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

(Emphasis added.)

48.     On this news, Lottery.com's stock price fell $0.146 per share, or over 15%, from a closing price of $0.966 per share on July 15, 2022 to a closing price of $0.82 per share on July 18, 2022, on abnormally high volume.

49.     Then, on July 22, 2022, Lottery.com filed another Form 8-K with the SEC in which the Company disclosed that it had been advised by its independent accountant that its audited financial statements for the fiscal year ended December 31, 2021 and unaudited financial statements for the quarter ended March 31, 2022 should no longer be relied upon.  In addition, in the July 22,

2022 8-K, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately.  Specifically, the Company's announcement provided that:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal year ended December 31, 2022, that the ***audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon***. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.
>
> * * *
>
> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidiaries and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

(Emphasis in bold and italics added.)

50.    On these disclosures, Lottery.com's shares fell $0.10, or more than 12%, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022 to a closing price of $0.72 per share on July 26, 2022.

51.    Finally, on July 29, 2022, in another Form 8-K filed with the SEC, the Company disclosed that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July 29, 2022.  Moreover, because Lottery.com's resources were not sufficient to fund its operations

21

for a twelve-month period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be forced to wind down its operations or pursue liquidation of the Company's assets.  In full, the Company stated that:

> **Item 8.01 Other Events.**
>
> On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that ***the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022***. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, ***a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations***.
>
> Additionally, ***the Company's capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern. If the Company is not able to secure additional capital resources or otherwise fund its operations, the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets***, including equipment and intellectual property.

(Emphases in bold and italics added.)

52.     In reaction to this news, Lottery.com's stock price lost 64% of its value in a single trading day, falling $0.52 per share, from a closing price of $0.815 per share on July 28, 2022 to a close of $0.295 per share on July 29, 2022.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lottery.com securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lottery.com securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lottery.com or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lottery.com;

- whether the Individual Defendants caused Lottery.com to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lottery.com securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lottery.com securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lottery.com securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lottery.com securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lottery.com securities and options at artificially inflated prices.  In furtherance of this unlawful

scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lottery.com securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lottery.com's finances and business prospects.

66.     By virtue of their positions at Lottery.com, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Lottery.com, the Individual Defendants had knowledge of the details of Lottery.com's internal affairs.

68.     Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Lottery.com.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lottery.com's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lottery.com's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Lottery.com's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.     During the Class Period, Lottery.com securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lottery.com securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lottery.com securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Lottery.com securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

72.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of Lottery.com, and conducted and participated, directly and indirectly, in the conduct of Lottery.com's business affairs.  Because of their senior positions, they knew the adverse non-public information about Lottery.com's misstatement of income and expenses and false financial statements.

74.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lottery.com's financial condition and results of operations, and to correct promptly any public statements issued by Lottery.com which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lottery.com disseminated in the marketplace during the Class Period concerning Lottery.com's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lottery.com to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Lottery.com within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lottery.com securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Lottery.com.   By reason of their senior management positions and/or being directors of Lottery.com, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lottery.com to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Lottery.com and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lottery.com.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 9, 2022                        Respectfully submitted,

**THE BRISCOE LAW FIRM, PLLC**

*/s/ Willie C. Briscoe*
WILLIE C. BRISCOE
State Bar Number 24001788
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 346-214-7463
wbriscoe@thebriscoelawfirm.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice application forthcoming*)
J. Alexander Hood II
(*pro hac vice application forthcoming*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

***Attorneys for Plaintiff***